**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KENT MAYNARD, JR,                ) | |
|                           ) | |
|     Plaintiff,              ) | |
|                           ) | |
|          v.                ) | Case No.: |
|                           ) | |
| THE CITY OF CHICAGO, a municipal     ) | |
| corporation; the CHICAGO POLICE       ) | |
| DEPARTMENT, as AGENT of the City of   ) | Jury Trial Demanded |
| Chicago; and Chicago Police Officer CARMEN ) | |
| MOSTEK (Star 8664);              ) | |
|                           ) | |
|     Defendants.           ) | |
| _____ ) | |

## VERIFIED COMPLAINT

Plaintiff Kent Maynard, Jr., by and through his attorney, James D. Benak Attorney LLC, complains and alleges as follows against Defendants THE CITY OF CHICAGO; the CHICAGO POLICE DEPARTMENT, as an AGENT of the City of Chicago; and Chicago Police Officer CARMEN MOSTEK (Star 8664), named as an agent of the City of Chicago and in her individual capacity:

## NATURE OF THE CASE

1.     The Plaintiff brings this civil rights action to recover damages under 42 U.S.C. §1983.

2.     The Police-affiliated Defendants violated Plaintiff's Fourth Amendment right to be secure in his person and property by using and/or promoting excessive force as a pattern and practice.

3.     Plaintiff also seeks relief for state law claims, as set forth hereinbelow.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §1331 and

jurisdiction over civil rights cases pursuant to 28 U.S.C. §1343.

5.      This Court also has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. §1367.

6.      Venue is proper in this District under Title 28 of the United States Code, §1931(b) because all incidents, events, and occurrences giving rise to this action occurred in the Northern District of Illinois, Eastern Division, and all parties reside in this District.

## PARTIES

7.      Plaintiff is a natural person who was, at times relevant hereto, a citizen of Illinois, residing in Chicago's Bridgeport neighborhood at 522 W. 29th Street #2, Chicago, IL 60602.

8.      Defendant Chicago Police Department Officer Carmen Mostek (Star 8664) ("Mostek") is a natural person who was, at times relevant hereto, a citizen of Illinois residing in Chicago's Bridgeport neighborhood at 520 W. 29th Street #2, Chicago, IL 60602. Mostek is sued in her individual capacity and as an agent of the City of Chicago.

9.      Defendant City of Chicago is a municipality duly incorporated under the laws of the State of Illinois and the employer of Chicago Police Officer Mostek.

10.     As part of its employment of Officer Mostek, the City issued Mostek a service firearm and required her to carry it with her in public, whether on duty or off duty.

11.     The City of Chicago is responsible for Mostek's conduct and the Chicago Police Department's policies, practices, and customs, whether written or unwritten.

## ALLEGATIONS OF FACT

12.     Plaintiff and Mostek have lived within a block of each other in Bridgeport for years and became next-door neighbors in October 2023.

13.     Plaintiff is a 68-year-old semi-retired man living in the rear unit of the two-unit, one-story home next door to Mostek.

14.     Since February 2021, Plaintiff has kept a "rescue" dog, Agatha, known as "Aggie," as a house pet.

15.     As such, Aggie is not a guard dog confined to an outside yard and has never been trained or encouraged to be aggressive or intimidating.

16.     As with most rescue dogs, Aggie, a female, is a mixed-breed dog.

17.     Here is a true and correct photographic depiction of Aggie as she appeared at times pertinent to the instant complaint:



18.     Since October 2023, Mostek and Plaintiff have occasionally encountered each other with their respective dogs, as Mostek habitually brought her dog, a "Corgi," into an enclosed area behind Plaintiff's apartment to micturate and defecate.

19.     Defendant Mostek and Plaintiff both saw that Aggie seemed to perceive Corgi's presence in the backyard as an intrusion into Aggie's space.

20.     A first attempt to introduce the two dogs to each other to establish comity did not succeed, so it was continued to an unspecified future date.

21.     On that and other occasions, Plaintiff and Mostek made the sort of small talk that neighbors often do.

22.     At all times pertinent hereto, the two dogs and their respective owners were neighbors, not strangers.

23.     Aggie was Plaintiff's constant companion, friend, and roommate.

24.     Plaintiff walked Aggie throughout Bridgeport between 26th Street and 35th Street two times a day, every day, in the early morning and early evening, covering at least three miles.

25.     Since February 2022, Plaintiff and Aggie have taken at least 1,500 walks, covering at least 2,000 miles, all with Aggie on a leash.

26.     During that time, Bridgeport residents (and their dogs) between 26th Street and 35th Street became accustomed to seeing Aggie and Plaintiff walking together, and the two made many fast friends.

27.     Aggie's affectionate and outgoing nature was a potent ice-breaker.

28.     Aggie frequently visited her favorite human and canine friends, particularly her two favorite dog friends, Dexter and Patrick, who lived with their respective families on Parnell south of 31st Street.

**OFFICER MOSTEK SHOT AGGIE AND NEARLY SHOT PLAINTIFF ACTING UNDER COLOR OF STATE LAW TO PROTECT PROPERTY**

29.     Sadly, Aggie's idyllic life as Plaintiff's best friend was cut short by an act of senseless brutality, carried out recklessly, wantonly, intentionally, and without justification by Defendant Mostek.

30.     MOSTEK SHOT AGGIE TO DEATH, WITHOUT JUSTIFICATION, AT POINT-BLANK RANGE WHILE AGGIE WAS IN PLAINTIFF'S ARMS AND PLAINTIFF WAS IN THE LINE OF FIRE.

31.     At approximately 11:25 a.m. on Sunday, April 21, 2024, Mostek was off-duty and walking her dog, a Corgi, east on 29th Street, just west of Normal Avenue.

32.     At 11:29 a.m., as Mostek and her Corgi passed in front of Plaintiff's residence, Aggie slipped past Plaintiff, exited the home, and ran to the northwest corner of Normal Avenue and 29th Street with Plaintiff in hot pursuit.

33.     Two videos of the incident show what happened next in less than five minutes.

34.     Aggie encountered Mostek's dog at the corner, and a skirmish ensued.

35.     When Mostek saw the two dogs rolling about, she immediately drew her service weapon and began to point it at Aggie.

36.     Within seconds, Plaintiff arrived on the scene and, focused exclusively on the dogs, almost immediately separated them by grabbing Aggie and immobilizing her.

37.     By this time, Plaintiff was focused on separating the dogs while, unknown to Plaintiff, Mostek was dead set on shooting Aggie.

38.     At no time did Mostek try to separate the dogs.

39.     That is because, at the outset, as her first (and only) response, Mostek firmly resolved to shoot Aggie ostensibly to protect her dog.

40.     In the very brief interval between drawing her weapon and discharging it, Mostek did not reconsider her decision to shoot and kill Aggie, even after a human being (Plaintiff) had entered the line of fire.

41.     After Plaintiff arrived on the scene, both Plaintiff and Mostek were moving toward the dogs, and they collided briefly as Plaintiff was throwing himself on top of Aggie and Mostek was positioning herself to take a shot.

42.     Immediately after the collision, Plaintiff landed on the ground, where he grabbed Aggie and held her to his chest, both of them lying on their right side on the pavement east of the curb.

43.     Mostek lost her balance in the collision with Plaintiff but nonetheless staggered forward, looking down at Aggie and Plaintiff lying together, literally cheek-by-jowl, on the ground.

44.     In that unstable position, lurching forward, Mostek fired a single shot.

45.     The bullet struck Aggie in her left ear, just inches from Plaintiff's head.

46.     The bullet killed Aggie instantly.

47.     Plaintiff had been too focused on separating the dogs to notice that Mostek was brandishing her weapon and trying to shoot Aggie.

48.     After the shot rang out, Plaintiff felt Aggie go limp and looked down and saw her eyes were lifeless and that blood was draining from her mouth.

49.     Plaintiff was enveloped in the gaseous discharge from Mostek's gun.

50.     With the acrid smell of gunfire in his nose, Plaintiff looked up toward the curb, where he saw Mostek standing, holding her gun, her uninjured dog at her side.

51.     Plaintiff asked, in shock and utter disbelief, "Did you just shoot my dog?"

52.     In a matter-of-fact voice, Mostek replied, "She attacked my dog."

53.     Those were the only words that Mostek uttered before she turned, walked, and then ran north on Normal Avenue towards the entrance of her apartment, her uninjured Corgi walking and then running beside her.

54.     At no time before disappearing into her home did Mostek exhibit any concern for her dog, who was obviously uninjured, or Plaintiff's dog, who was obviously dead.

55.     Mostek decided to shoot Aggie the instant the skirmish began when she first unholstered her weapon.

56.     Thereafter, Mostek did not let anything—not even Plaintiff's presence in the line of fire—deter her from that course of action.

57.     As such, Mostek's first and only response to the dogfight was to unholster her service weapon and use deadly force.

58.     After killing Aggie *and very nearly killing Plaintiff,* Mostek ran off and cloistered herself in her apartment.

59.     Many neighbors who knew and loved Aggie gathered outside, many openly weeping.

60.     On information and belief, Mostek secreted herself in her apartment after the incident because she knew that she had used excessive (and deadly) force, thereby committing an obvious violation of CPD policies while violating Plaintiff's constitutional rights and, on information and belief, was under the influence of alcohol.

61.     Seconds after the shooting, an eyewitness in a second-floor apartment on the south side of 29th Street placed a 911 call to report that Mostek had shot a man who was lying on the ground.

62.     That is because Plaintiff and Aggie were so close together when Mostek fired that the shot that killed Aggie appeared to be intended for Plaintiff.

63.     In any event, here is a true and accurate photographic depiction of Aggie's appearance shortly after Mostek shot her:



64. To kill Aggie in defense of property, Mostek discharged her service weapon on a public sidewalk in a densely populated residential neighborhood on a sunny Sunday morning.

65. Significantly, Mostek killed Aggie *while pointing the gun at Plaintiff*, who was holding Aggie.

66. Inexplicably, Mostek used deadly force to protect property at a time when there was no threat of harm to that property – or to Mostek herself.

67. While staggering out of control and out of balance, Mostek discharged her service weapon, and the bullet she fired missed Plaintiff's head by a matter of inches.

68. It does not matter whether Mostek was aiming at Aggie or a hole in the ground; she fired a round that could have very easily killed Plaintiff directly or by ricochet – at a time when there was no threat to Mostek, her dog, or anyone else.

**THE RESPONDING CPD OFFICERS STUDIOUSLY AVOIDED LEARNING ANYTHING THAT MIGHT SUGGEST MOSTEK ACTED IMPROPERLY**

69.     Many police officers responded to the scene after the shooting, dutifully putting up tape around Aggies' body where she lay in a pool of blood on the street and aggressively shouting orders to those standing by.

70.     Curiously, none of the responding officers did anything to learn the true facts about what had occurred.

71.     Instead of conducting a good-faith investigation, they set the stage for a code-of-silence coverup that would permit Mostek to fabricate a story whitewashing her outrageous conduct.

72.     To preserve their willful ignorance of Mostek's depraved-heart conduct:

- no CPD officer asked if anyone had seen what happened;

- no CPD officer conducted an interview or took down contact information from the multiple witnesses who were present and expressed a willingness to talk; and

- no CPD officer asked the Plaintiff, who was easily identified, what had happened.

73.     To avoid learning anything remotely connected to the truth, CPD officers limited their investigation to one interview of one person: Mostek, whom they visited privately, in her apartment, away from public view.

74.     By contrast, Plaintiff collected contact information from multiple witnesses who, on information and belief, have already advised COPA investigators that Mostek's shot was taken *after* the encounter between the two dogs had ended and while Plaintiff was lying on the pavement

next to his dog directly in the line of fire, a fact that Mostek did not include in her statement to CPD investigators.

75.     In response to CPD's questions about the incident, Carmen shamelessly fabricated a clichéd story about a vicious pit bull running at large that was in the process of killing her dog, its jaws locked around her dog's neck, forcing her heroically to intervene and save her dog's life.

76.     This bald-faced lie was reported in the press.

77.     It is a violation of CPD policies to submit a false report.

78.     The false narrative for the false police report came directly from Defendant Mostek because she was the only witness interviewed by CPD Officers.

79.     In Mostek's cover-up story, Mostek's use of deadly force was justified as necessary to protect property – without mentioning that the deadly force was, in fact, not needed to protect anything at all and had put Plaintiff's life – a human being's life -- in peril.

80.     CPD passively and unquestioningly accepted Mostek's false narrative without any attempt to verify its accuracy.

81.     Even a cursory investigation by CPD would have revealed that Mostek shot a house pet as it was held in her owner's arms, not a pit bull that was mauling her dog.

82.     Even if it were true (it is not), Mostek's exculpatory narrative would not justify her conduct as a matter of law because there is no license to use deadly force against a human being to protect property.

83.     In shooting Aggie in cold blood, Mostek exhibited complete disregard for the sanctity of human life and used grossly disproportionate force against Plaintiff when neither he nor Aggie presented any threat to her – or her dog.

84.     Before her use of excessive force, Mostek did not direct Plaintiff to step away from

Aggie, nor did she warn Plaintiff that she was about to fire her weapon as she held it pointed at him.

85.     Mostek's use of excessive force was promoted, tolerated, and condoned by a culture of over-aggressive policing in the Chicago Police Department.

86.     Her brutal overreaction placed Plaintiff's life in jeopardy and deprived Plaintiff of security in his person and property without due process of law.

87.     Mostek and the responding officers, purportedly on the scene to investigate what happened, automatically engaged in a cover-up in accordance with CPD's pattern and practice of allowing CDP officers to engage in deadly misconduct with impunity.

88.     Mostek's conduct on April 21, 2024, shows that even though neither she nor her dog was subject to any imminent threat of harm, she was unwilling or unable to determine a necessary, reasonable, and proportional use of deadly force.

89.     The instant action is necessary to redress Mostek's outrageous conduct because the CPD has not made a good-faith effort to investigate and enforce its written rules for using deadly force and cannot be relied upon to do so.

90.     Mostek's conduct demonstrates that she is a clear and present danger to public safety and should be discharged from any duties requiring her to carry a weapon in public if not forbidden to carry a weapon at all.

**MOSTEK ORCHESTRATED A CAMPAIGN OF HARASSMENT AND INTIMIDATION AGAINST PLAINTIFF TO PROCURE HIS SILENCE**

91.     In the days after the incident, some of the many people Aggie had befriended on her daily walks showered Plaintiff with condolences.

92.     One such condolence that is representative of the many others is as follows:



93. The neighborhood also spontaneously created a memorial to Aggie, including, among other things, Aggie's collar and leash, thus:



94. Within 48 hours, someone took the memorial down during the night.

95. On information and belief, that "someone" was Mostek, who threw many of the objects in the memorial into the garbage cans behind her apartment.

96. Aggie's friends in the community immediately rebuilt the memorial to look like this:

-12-



97. Within a day, the memorial was again taken down, with all the objects and messages thrown in a garbage can behind Mostek's apartment.

98. Significantly, Plaintiff's apartment and Carmen's next-door apartment share a common owner.

99. In the week after the shooting, Plaintiff heard rumors that Carmen was "working the phones" to dispel -- by telling lies and slandering Plaintiff -- the appearance that she was a trigger-happy sociopath who presented a clear and present danger to the community.

100. On Sunday, April 28, 2024, one week from the date of Aggie's execution, Plaintiff was advised that, because of false and defamatory statements made by Mostek, his Landlord was giving him two weeks to quit his apartment.

101. On information and belief, Mostek told Landlord that Mostek had killed Aggie because she was a vicious pit bull and a danger to the community and that Plaintiff was an irresponsible scofflaw who could not be trusted to ensure that his dog did not harm others.

102. Based on Mostek's lies, Landlord purported orally to terminate Plaintiff's leasehold such that he, a 68-year-old man, is now subject to mid-term eviction if Mostek's lies are given full effect.

103.     Mostek's first wrongful act was the excessive use of deadly force that endangered a Plaintiff's life without any justification.

104.     Mostek's second wrongful act was making a false police report based on a story that she knew was false.

105.     Mostek's third wrongful act was the orchestration of a campaign to harass, intimidate, and defame Plaintiff into silence and force him out of his home.

## CPD'S CONDUCT FOLLOWED A FAMILIAR PATTERN: EXPLOIT THE CODE OF SILENCE TO LIE AND HIDE THE TRUTH

106.     Since 2019, CPD has been operating under a court-imposed consent decree because of its stubbornly persistent pattern and practice of using excessive force.

107.     This pattern and practice is not due to a lack of written policies: CPD has strict written rules about using deadly force.

108.     However, written rules have no impact unless they are respected and followed in practice.

109.     That is not the case here.

110.     CPD disregards its written rules and follows a custom and practice that holds that CPD officers are above the law and protected by a code of silence.

111.     Given the CPD's longstanding pattern and practice of over-aggressive and violent responses to civilian encounters, even in the absence of any crime, it is not surprising that the CPD officers who responded to Aggie's execution did not want to learn the truth about what happened.

## MOSTEK'S USE OF DEADLY FORCE VIOLATED CDP POLICIES

112.     Chicago Police Department General Order G03-02 ("the General Order") governs the use of deadly force by police officers in the field.

113.     General Order Article II, sections A. and B. state as follows:

-14-

A. Sanctity of Human Life. The Department's highest priority is the sanctity of human life. In all aspects of their conduct, Department members will act with the foremost regard for the preservation of human life and the safety of all persons involved.

B. Public Cooperation. A strong partnership with the public is essential for effective law enforcement. Inappropriate or excessive uses of force damage that partnership and diminish the public trust that is a cornerstone of policing in a free society.

114. Article III of the General Order provides that police officers may only use force that is objectively reasonable, necessary, and proportional in order to ensure the safety of a member or third person, stop an attack, make an arrest, control a subject, or prevent escape.

115. Factors that may be considered in determining whether force was objectively reasonable include whether the subject poses an imminent threat to the officer or others, the risk of harm, the level of threat or resistance presented by the subject, and the subject's proximity or access to weapons.

116. Article III B 4 provides that police will use de-escalation techniques to prevent or reduce the need for force when it is safe and feasible to do so "based on the totality of the circumstances[, including] continually assessing the situation and modifying the use of force as circumstances change and in ways that are consistent with officer safety."

117. Article III B 5 states, "[t]he use of excessive force, unwarranted physical force, or unprofessional conduct by a Department member is prohibited and will not be tolerated" and that "Force used as punishment or retaliation is prohibited."

118. According to the General Order, deadly force includes both pointing and discharging a firearm in the direction of a person.

119. An "imminent threat" must exist to justify using deadly force.

120. An "imminent threat" exists when it is objectively reasonable to believe three *conjunctive* elements, namely:

- the subject's actions are immediately likely to cause death or great bodily harm to the member or others unless action is taken; and

- the subject has the means or instruments to cause death or great bodily harm; and

- the subject has the opportunity and ability to cause death or great bodily harm.

121.    The General Order, distilled to its essence, provides that deadly force is a last resort that can only be used directly to address an imminent threat to a human being.

122.    Imagined threats of imminent harm to property are not included in the definition of "imminent threat."

123.    Significantly, the General Order does not permit using deadly force against a human being to nullify a threat of harm to property, even if that had occurred here (it did not; Mostek's dog was unharmed).

124.    Article Five of the Rules and Regulations of the Chicago Police Department sets forth various prohibited acts, including:

Rule 8: Disrespect to or maltreatment of any person *while on or off duty.*

Rule 9: Engaging in any unjustified verbal or physical altercation with any person, while on or off duty.

COMMENT: Rules 8 and 9 ***prohibit the use of any excessive force by any membe****r.* ***These rules prohibit all brutality****,* and physical or verbal maltreatment of any citizen *while on or off duty*, including any unjustified altercation of any kind.

Rule 15: Making a false report, written or oral;

Rule 38: ***Unlawful or unnecessary use or display of a weapon***;

125.    As stated, the foregoing written rules are observed only in the breach.

126.    In violation of CPD's written policies and applicable law, Mostek and other police officers routinely apply their customary use of excessive force without fear of being held to account because violations are routinely covered up or explained away, especially where the police

have executed the only witness who can reveal the truth.

**THE CITY IS RESPONSIBLE FOR MOSTEK'S USE OF EXCESSIVE FORCE BECAUSE SHE ACTED IN CONFORMITY WITH THE CPD'S CULTURE OF VIOLENCE AND CODE OF SILENCE**

127. At all times pertinent hereto, Mostek was acting under color of state law and within the scope of her employment with the City of Chicago as a sworn police officer and is sued here in her individual capacity and as an agent of the City of Chicago.

128. While a peace officer is expected to protect persons and property, the limitations on using deadly force are not the same for persons as property.

129. Put simply, using deadly force is not permitted to protect property.

130. Chicago is responsible for CPD's written and customary policies, practices, and customs, including those applicable to the use of deadly force.

131. The City is also responsible for enforcing its written policies, practices, and customs in the field.

132. As alleged with particularity herein, Defendants violated rights secured to Plaintiff by the due process Clause of the Fourth Amendment to the United States Constitution.

133. Plaintiff has been damaged and will continue to be damaged by Defendants' actions and is entitled to injunctive and declaratory relief and monetary damages.

134. The instant suit seeks relief for Defendants' violation of the due process Clause of the Fourth Amendment to the United States Constitution, which violation is actionable under 42 U.S.C.A. §1983.

135. Defendants are "persons" under 42 U.S.C.A. §1983.

136. Defendants acted "under color of state law" for purposes of 42 U.S.C.A. §1983.

137.    Mostek drew and fired her City-issued service firearm to protect property – thereby placing Plaintiff's life in jeopardy.

138.    Defendants acted with deliberate indifference to Plaintiff's rights to be secure in his person and property by, among other things, putting his life in danger in order gratuitously to kill his dog.

139.    At all times pertinent hereto, the City of Chicago was Officer Mostek's employer and had issued to her a service firearm that she was required to carry even when off duty.

**CPD HAS A LONG AND STUBBORN PATTERN AND PRACTICE OF EXCESSIVE DEADLY FORCE**

140.    In December 2015, the U.S. Attorney General launched a broad civil rights investigation into CPD's corrupt policing practices.

141.    In January 2017, the U.S. Department of Justice (DOJ) released the results of its investigation, finding a longstanding, pervasive "pattern or practice" of civil rights abuses by the CPD, including excessive use of deadly force.

142.    In August 2017, the Office of the Illinois Attorney General (OAG) sued the City of Chicago in federal court, seeking a Consent Decree to address DOJ's findings and recommendations.

143.    Judge Dow presided over the OAG suit against Chicago.

144.    In that proceeding, OAG negotiated a Consent Decree with the City.

145.    In March 2018, the Parties to the Consent Decree—the OAG and the City—also entered into a Memorandum of Agreement with certain community organizations committed to monitoring, enforcing, and educating the community about the Consent Decree.

146.    The OAG and the City sought proposals for an Independent Monitoring Team for the Consent Decree ("IMT").

147. Judge Dow approved and signed the Consent Decree on January 31, 2019.

148. An independent monitor was named on March 1, 2019, the effective date of the Consent Decree.

**CPD CONTINUES UNCONSTITUTIONALLY TO USE DEADLY FORCE DESPITE THE DOJ INVESTIGATION, THE OAG SUIT, THE CONSENT DECREE, THE IMT, AND THE PATF**

149. Even after the establishment of the IMT and the so-called Police Accountability Task Force ("PATF"), the pattern and practice of hyper-aggressive policing has been perpetuated by cover-ups whenever necessary to protect a fellow officer from scrutiny.

150. Mostek used excessive and unconstitutional force on April 24, 2024, because she believed she would never be called to account for her conduct and that her fellow officers could be relied upon to accept whatever exculpatory nonsense she fed them.

151. Mostek was following CPD's longstanding policy and practice of encouraging officers to point guns at community members without justification when she pointed her gun at the Plaintiff and fired.

152. In disregard of written policies, Chicago police officers routinely point their guns at people at the first instance of uncertainty rather than as a last resort.

153. According to CPD's own data, Chicago police officers point guns at people an average of nearly ten times a day.

154. Police officers pointed their guns at over 3,500 adults and children in 2022.

155. According to CPD's own data, CPD documented uses of gun-related force have risen significantly over the past several years.

156. From 2022 to 2023, CPD officers were on track to increase instances of gun pointing by 19%.

157. From 2022 to 2021, there was also a 22% increase.

158. Mostek's conduct on April 21, 2024, directly results from CPD's failure to enforce its written policies on using deadly force.

159. CPD has failed to comply with the existing Consent Decree requirements for curbing the excessive use of guns.

160. CPD has failed to promulgate policies, procedures, and practices sufficient to prevent officers from unreasonably and unlawfully pointing guns at community members.

161. CPD, as a matter of pattern and practice, relies upon overly aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force.

162. In encounters with individuals that begin consensually, or in cases in which officers stop individuals purportedly for low-level violations, officers repeatedly use the most intrusive forms of police response possible-including guns.

163. They do so even where, as here, individuals do not present a threat to the officers or other bystanders.

164. Even where some use of force may be justified, CPD officers, as a matter of practice and despite written regulations, use a higher level of force than is objectively reasonable.

165. The DOJ observed this trend of escalation in shootings, finding CPD officers regularly engaged in "unnecessarily escalating confrontations," which resulted in "avoidable uses of force and resulting harm, including deaths."

166. PATF similarly found "many examples of CPD encounters with citizens in routine situations that have gone tragically wrong."

167. The Task Force acknowledged widespread reports from Chicagoans that officers approach routine situations with over-aggressiveness and hostility.

168. The Consent Decree contains several provisions crafted to end CPD's unlawful use of excessive force and violence.

169. However, CPD has failed to comply with the Consent Decree.

170. Paragraph 153 provides that CPD's use of force policies must comply with relevant law and require "officers apply de-escalation techniques to prevent or reduce the need for force whenever safe and feasible."

171. CPD does not comply with this provision because it has not completed related training.

172. Paragraph 155 provides that CPD policy should "reduce the circumstances in which using force is necessary, and to ensure accountability when CPD officers use force that is not objectively reasonable, necessary, and proportional under the totality of the circumstances."

173. CPD has failed to comply with this provision and, indeed, perpetuates the code of silence to hide its disregard for its written rules.

174. Paragraph 156 provides that CPD's policies, training, supervision, and accountability systems will ensure, among other things, that CPD officers "act at all times in a manner consistent with the sanctity of human life; act at all times with a high degree of ethics, professionalism, and respect for the public; use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible."

175. CPD has not complied with this provision because its policies related to "training, supervision, and accountability systems remained incomplete.

176. The IMT states, "We urge the CPD to pay additional attention to its Use of Force supervision and accountability requirements and systems . . . ."

177.    The IMT further documents that "the current implementation of systems does not promote supervision and accountability."

178.    Paragraph 161 provides that "CPD officers must use de-escalation techniques to prevent or reduce the need for force whenever safe and feasible."

179.    The IMT notes, "public perception of the CPD's de-escalation skills is heading in the wrong direction. In response to the question, 'Over the past 12 months, how good of a job do you think the Chicago Police in your neighborhood are doing on . . . de-escalating tense situations,' a higher percentage of respondents in 2022 as compared to 2020 answered 'very poor' or 'poor' (21.8% to 18.9%), and a lower percentage answered 'good' or 'very good' (39.9% to 49%)."

180.    Paragraph 192 states, "A designated unit at the CPD headquarters level will routinely review and audit documentation and information collected from all investigatory stop and arrest occurrences in which a CPD officer pointed a firearm at a person in the course of effecting a seizure."

181.    CPD has failed to comply with this provision because it has failed sufficiently to staff the use of force review unit. As a result, CPD officers' uses of force are not promptly reviewed.

182.    As a result of the foregoing failures related to escalatory conduct and the use of force, hundreds of people experience unlawful violence and other forms of misconduct at the hands of CPD officers *despite the Consent Decree's existence*.

183.    In 2021, the Civilian Office of Policy Accountability ("COPA") sustained 732 allegations that CPD officers engaged in a range of misconduct, including excessive force and unnecessarily displaying a weapon.

184.    In 2022, COPA sustained 905 allegations against CPD officers.

185.    In 2023, COPA sustained 758 allegations.

186.    These findings show the stubborn persistence of CPD's tradition of unlawful violence.

187.    The foregoing failures are the direct cause of Mostek's misconduct because, among other things, Mostek's hair-trigger use of a firearm was consistent with the real, as distinct from the written guidelines and policies followed by the City and CPD.

188.    Notwithstanding its written regulations, CPD maintains a policy, practice, and custom of encouraging officers to use excessive force.

189.    When Mostek subjected Plaintiff to unreasonable and unlawful violence, she did so in conformity with the CPD's *real* policies, not the words on a sheet of paper.

**CPD SYSTEMATICALLY FAILS TO HOLD ACCOUNTABLE OFFICERS WHO LIE OR REMAIN SILENT ABOUT POLICE MISCONDUCT, INCLUDING THE USE OF EXCESSIVE FORCE.**

190.    CPD has maintained a widespread practice of failing to discipline and hold accountable Chicago police officers who lie or remain silent about police misconduct -- including discriminatory policing, excessive force, and Fourth Amendment violations.

191.    CPD trains its officers to disregard written rules and follow a "code of silence" in their policing.

192.    One officer testified to being told repeatedly at the academy that "[W]e do not break the code of silence. Blue is Blue. You stick together. If something occurs on the street that you don't think is proper, you go with the flow. And after that situation, if you have an issue with that officer or what happened, you can confront them. If you don't feel comfortable working with them anymore, you can go to the watch commander and request a new partner. But you never break the code of silence."

193.    In *Obrycka v. City of Chicago*, 07-CV-2372 (N.D. Ill.), a federal jury found that, as of February 2007, the City of Chicago "had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

194.    In a 2015 speech, Mayor Emanuel acknowledged that CPD uses a "code of silence" to conceal abuses and wrongdoing.

195.    In April 2016, PATF (see [www.chicagopatf.org](www.chicagopatf.org)) issued a report with "recommendations for reform." [1]

196.    PATF reported that the code of silence is "institutionalized and reinforced by CPD rules and policies that are also baked into the labor agreements between the various police unions and the City."

197.    The DOJ investigation confirmed that a code of silence pervades CPD

198.    One CPD sergeant informed DOJ investigators that "if someone comes forward as a whistleblower in the Department, they are dead on the street."

199.    As the DOJ found, the code of silence extends to sergeants and other supervisors who, as they did in the instant case, take affirmative actions to cover up their subordinates' misconduct.

200.    The DOJ determined the code is "strong enough to incite officers to lie even when they have little to lose by telling the truth." This is because "officers do not believe there is much to lose by lying."

201.    Given the systematic lack of discipline, CPD officers are allowed to amass dozens of complaints without any consequences.

---

[1] See [https://chicagopatf.org/wp-content/uploads/2016/04/PATF_Final_Report_4_13_16-1.pdf](https://chicagopatf.org/wp-content/uploads/2016/04/PATF_Final_Report_4_13_16-1.pdf)

202.     Although several Consent Decree provisions aim to eliminate the code of silence and improve officer accountability, CPD has failed to comply with most of these terms. Indeed, the City has failed to reach preliminary compliance with the vast majority of accountability provisions.

203.     CPD's long and sad history of failed reform relates directly to Mostek's actions.

204.     CPD maintains a policy, practice, and custom of failing to discipline, supervise, monitor, and control its officers, including Mostek.

205.     Consequently, the City allows its officers to believe they can abuse and violate individuals' rights without consequence.

206.     These policies, practices, and customs are the same as those that allowed Jason Van Dyke and multiple fellow officers to believe they could cover up Van Dyke's actions in the McDonald case and, more recently, to violate Dexter Reed's rights with impunity.

207.     As such, the City of Chicago is responsible for i) the wrongful acts of defendant Mostek alleged herein, committed with her City-issued service weapon in a grotesquely distorted attempt to protect property; ii) the cover-up in the context of the code of silence; and iii) the campaign of harassment, defamation, and witness intimidation that followed.

## COUNT I
## VIOLATION OF FOURTH AMENDMENT
## EXCESSIVE USE OF FORCE
## (AGAINST OFFICER MOSTEK)

208.     Plaintiff incorporates the allegations set forth in the preceding paragraphs as though stated herein.

209.     At all relevant times, Plaintiff had a constitutional right to be free from excessive force under the Fourth Amendment to the United States Constitution.

210. Defendant Officer Mostek violated Plaintiff's Fourth Amendment rights when she recklessly and unreasonably fired her gun at Plaintiff without legal justification.

211. Police officers are prohibited from discharging firearms at community members unless objectively reasonable under the totality of the circumstances.

212. At the moment Mostek first pointed her gun at Plaintiff, no reasonable officer could have considered Plaintiff (or his dog) a threat.

213. As such, Mostek's conduct was objectively unreasonable and violated Plaintiff's civil rights.

Wherefore, Plaintiff prays for judgment against Defendant Chicago Police Department Officer Carmen Mostek for compensatory and punitive damages, costs, attorney's fees, interest, and any other relief the Court deems fit.

**COUNT II**
**42 U.S.C. § 1983 *MONELL***
**PATTERN AND PRACTICE OF USING EXCESS FORCE**
**(AGAINST CITY OF CHICAGO)**

214. Plaintiff incorporates the allegations set forth in the preceding paragraphs as though stated herein.

215. The City of Chicago has a long-standing pattern and practice of using excessive force, including excessive deadly force.

216. This pattern and practice had been in place for years before the shooting alleged herein, as evidenced by the allegations above. Specifically, in 2017, the DOJ documented that CPD members routinely use violent, aggressive practices and that CPD has failed to take any meaningful action to address such unlawful violence.

217.    The City of Chicago has been aware of these patterns and practices and their unlawfulness but has failed to implement reasonable and necessary means to address and resolve the pattern and practice of the unlawful use of excessive force that has persisted for years.

218.    The deeply entrenched and widespread pattern and practice described above and throughout this Complaint was a moving force behind the shooting and the other violations of Plaintiff's rights.

219.    As a direct and proximate result of the widespread pattern and practice described above and throughout this Complaint, Plaintiff's rights were violated when his pet dog was shot and killed just inches away from his head.

220.    As a consequence of that inexplicably excessive conduct, Plaintiff has suffered pain and injury, including emotional anguish, fear, anxiety, and the loss of property and liberty, as is more fully described throughout this Complaint.

Wherefore,  Plaintiff prays for judgment against Defendant City of Chicago for compensatory damages, punitive damages, costs, interest, and other relief the Court deems fair and just.

### COUNT III
### 42 U.S.C. § 1983 – *MONELL*
### FAILURE TO TRAIN, SUPERVISE AND DISCIPLINE
### (AGAINST CITY OF CHICAGO)

221.    Plaintiffs incorporate the allegations set forth in all preceding paragraphs as though fully stated herein.

222.    A municipality's failure to train supports §1983 liability where such failure is the product of deliberate indifference to the constitutional rights of the municipality's inhabitants. *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).

223.    The same is true when a municipality fails to hold officers accountable for their actions such that officers believe they can act with impunity.

224.    The City of Chicago has a long history of its Police Officers using unreasonable force, including deadly force, so the City knew that increased and improved training in areas such as the proper use of force, especially deadly force, was necessary.

225.    Notwithstanding that knowledge and cries for reform, the City of Chicago's indifference has persisted, as exemplified by its continuing failure to provide adequate and appropriate training, supervision, and discipline to its Police Officers on the use of force, such as determining the appropriate level of force used in response to a dogfight.

226.    Because adequate policies and reforms are not promulgated and implemented, City of Chicago Police Officers are not trained, supervised, and disciplined appropriately.

227.    The City of Chicago's failure to act shows deliberate indifference to the constitutional rights of its inhabitants -- as was plain in the recent case of Dexter Reed -- because the City knew that such reforms and training were necessary.

228.    As a direct and proximate result of the City of Chicago's deliberate indifference to training and accountability, particularly in the context of the use of excessive force, Plaintiff suffered injuries including, but not limited to, pain, suffering, fear, and mental anguish.

Wherefore, Plaintiff prays for judgment against Defendant City of Chicago for compensatory damages, punitive damages, costs, interest, and other relief the Court deems fair and just.

## COUNT IV
## WILLFUL AND WANTON MISCONDUCT
## (AGAINST MOSEK)

229.    Plaintiff incorporates by reference all preceding paragraphs.

230.    The City of Chicago and its agents, the Chicago Police Department and Officer Carmen Mostek (Star 8664), engaged in willful and wanton misconduct.

231.    Mostek pointed her gun at Plaintiff and discharged it, causing the bullet to strike inches from Plaintiff's head.

232.    Defendants, at all relevant times, owed Plaintiff a duty not to act in a manner that Defendant knew or should have known would cause damages to Plaintiff's physical and emotional well-being.

233.    Defendant's acts were willful, wanton, and deliberately indifferent to the safety of Plaintiff's life.

234.    As a direct and proximate result of willful and wanton conduct by the City of Chicago and its Agent, Chicago Police Department Officer Carmen Mostek, Plaintiff suffered grievous harm and emotional distress.

235.    Defendant's acts constitute willful and wanton misconduct committed under circumstances exhibiting a reckless disregard for the safety of others.

Wherefore,  Plaintiff prays for judgment against Chicago Police Department Officer Mostek for compensatory damages, punitive damages, costs, interest, and any other relief the Court deems fair and just.

### COUNT V
### ASSAULT
### (AGAINST MOSTEK)

236.    Plaintiff incorporates by reference all preceding paragraphs.

237.    The City of Chicago and its agents, the Chicago Police Department, and Officer Carmen Mostek, Star No. 8664, engaged in willful and wanton misconduct.

238.    As alleged above, Chicago Police Department Officer Mostek, acting under color of law within the scope of her employment, engaged in offensive conduct and thereby placed Plaintiff in fear of imminent threat to his life, safety, and security without justification.

239.    Mostek's actions were undertaken intentionally, willfully and wantonly, or recklessly.

240.    The misconduct described in this Count was objectively unreasonable and was undertaken with intentional disregard for Plaintiff's rights.

241.    Mostek's exculpatory fiction is meritless on its face: There is no qualified privilege to threaten a human being with imminent death or serious harm to protect property – especially when no property or person is under threat.

242.    As a result of the misconduct of Mostek, Plaintiff suffered pain and injury, including emotional anguish, fear, anxiety, and loss of life and liberty.

Wherefore,  Plaintiff prays for judgment against Chicago Police Department Officer Mostek for compensatory damages,  punitive damages, costs, interest, and any other relief the Court deems fair and just.

### COUNT VI
### DEFAMATION
### (AGAINST MOSTEK)

243.    Plaintiff incorporates by reference all preceding paragraphs.

244.    After the shooting, to cover up her misconduct and intimidate Plaintiff into silence, Mostek made multiple false statements about Plaintiff.

245.    Mostek intentionally and maliciously sought to punish Plaintiff for being a troublesome victim of her misconduct by telling the parties' mutual landlord that Plaintiff's dog was a dangerous and vicious pit bull that Plaintiff allowed to run amok in the Bridgeport neighborhood.

246.    The statement was false, and Mostek knew it was false.

247.    To interfere with Plaintiff's tenancy in his apartment and damage his reputation in the community, Mostek published false and defamatory statements about Plaintiff to the parties' mutual landlord, intending that landlord terminate Plaintiff's tenancy for cause.

248.    On April 28, 2024, the Plaintiff advised that the Landlord was moved by Mostek's false statements and wanted the Plaintiff to quit his apartment within two days.

249.    As such, Mostek's malicious publication of a falsehood intended to whitewash her misconduct has harmed Plaintiff and subjected him to unbearable stress, just as he was grieving and trying to come to grips with nearly being killed when Mostek killed his dog.

250.    Plaintiff has suffered and will continue to suffer damages as a result of Mostek's false statements.

Wherefore,  Plaintiff prays for judgment against Chicago Police Department Officer Mostek for compensatory and punitive damages, costs, interest, and any other relief the Court deems fair and just.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## (AGAINST MOSTEK)

251.    Plaintiff incorporates by reference all preceding paragraphs.

252.    Mostek pointed and discharged a gun at Plaintiff.

253.    The shot Mostek fired killed Plaintiff's dog, but it could have just as easily killed Plaintiff.

254.    Plaintiff lost a beloved pet and came within inches of losing his life.

255.    Mostek's conduct was extreme and outrageous.

256.    Mostek intended to cause or recklessly disregarded the probability of causing emotional distress to Plaintiff.

257.     Plaintiff suffered severe emotional distress because Mostek's conduct at once killed a beloved companion and placed him in fear for his life.

258.     Mostek's outrageous and excessive use of deadly force proximately caused Plaintiff's emotional distress.

Wherefore,  Plaintiff prays for judgment against Chicago Police Department Officer Mostek for compensatory and punitive damages, costs, interest, and any other relief the Court deems fair and just.

**COUNT VIII**
**RESPONDEAT SUPERIOR**
**(AGAINST CITY OF CHICAGO)**

259.     Plaintiff incorporates by reference all preceding paragraphs.

260.     At all times relevant hereto, the City of Chicago was the employer of Officer Mostek.

261.     At all times relevant, Officer Mostek was, as she sought to protect a threat of damage to property, acting in the course and scope of her employment by the City of Chicago and acting under color of law.

262.     The City of Chicago is vicariously liable for the acts and omissions of Chicago Police Department Officer Mostek.

Wherefore,  Plaintiff prays for judgment against the City of Chicago for compensatory damages, punitive damages, costs, interest, and other relief the Court deems fair and just.

**COUNT IX**
**INDEMNIFICATION UNDER 745 ILCS 10/9-102**
**(AGAINST CITY OF CHICAGO)**

263.     Plaintiff incorporates by reference all preceding paragraphs.

264.     At all times relevant hereto, the City of Chicago has been the employer of Chicago Police Department Officer Mostek.

265.     Mostek was acting in the course and scope of her employment by the City of Chicago and acting under the color of law when she used her City-issued firearm to prevent property damage.

266.     Pursuant to 745 ILCS 10/9-102, the City Of Chicago is liable for any judgment for compensatory damages, attorneys' fees, and costs for the acts and omissions of Chicago Police Department Officers, including Officer Mostek.

Wherefore, Plaintiff prays for judgment against the City of Chicago for compensatory damages, punitive damages, costs, interest, and any other relief the Court deems fair and just.

## COUNT X
## NEGLIGENT HIRING AND RETENTION
## (AGAINST CITY OF CHICAGO)

267.     Plaintiff incorporates by reference all preceding paragraphs.

268.     At all times relevant, the City of Chicago has been the employer of Chicago Police Department Officer Mostek.

269.     CPD knew or should have known that Mostek lacks the mental capacity to make and modify, in response to changing circumstances, a decision to use deadly force.

270.     Mostek's obvious mental deficit creates a palpable danger of harm to third persons;

271.      Mostek's mental deficit was known or should have been known at the time CPD hired Mostek or at times thereafter when it decided to retain her in her position.

272.      Mostek's lack of mental capacity proximately caused Plaintiff's injury because after making a grossly inappropriate decision to use deadly force, Mostek was unable to alter course even as her decision became even more grossly inappropriate in light of changed circumstances – namely, the interposition of a human being between Mostek and the dog she was determined to kill.

Wherefore, Plaintiff prays for judgment against the City of Chicago for compensatory damages, costs, punitive damages, interest, and any other relief the Court deems fair and just.

### JURY DEMAND

Plaintiff demands trial by jury on all claims and all issues.

Dated this 3rd day of May 2024.

Respectfully submitted,

Kent Maynard, Jr.

By: _____

James D. Benak
His Attorney

James D. Benak
ARDC No. 6205007
James D. Benak Attorney LLC
335 North Garfield Street
Hinsdale, IL 60521
jbenak@jbenaklaw.com
(312) 497-0281 (office and mobile)
(224) 376-6813 (fax)

## VERIFICATION

I, Kent Maynard, Jr., declare as follows:

I am the Plaintiff named in the foregoing Complaint.

I have personal knowledge of Officer Carmen Mostek's use of deadly force against me on April 21, 2024.

I have personal knowledge of the other facts alleged in the foregoing Complaint, and if called upon to testify, I would competently testify as to the matters stated therein.

I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Complaint are true and correct.

Executed on May 3, 2024.

Kent Maynard Jr

Digitally signed by Kent Maynard Jr
DN: cn=Kent Maynard Jr, o=Kent Maynard & Associates LLC, ou, email=service@kentmaynard.com, c=US
Date: 2024.05.03 10:49:36 -05'00'

Kent Maynard, Jr.