IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Kent Maynard, Jr.              )
                               )
        Plaintiff,             )
                               )
    v.                         )   No. 24 C 3612
                               )
                               )
THE CITY OF CHICAGO, a         )
municipal corporation, and     )
Chicago Police Officer         )
CARMEN MOSTEK (Star 8664)      )
                               )
        Defendants.            )


<u>Memorandum Opinion and Order</u>

On April 21, 2024, as plaintiff Kent Maynard, Jr., opened the front door to his Chicago apartment, his dog Aggie slipped past his legs and ran down the sidewalk, with plaintiff in hot pursuit. Seconds later, Aggie lay dead, shot in the head by plaintiff's neighbor, defendant Carmen Mostek, an off-duty Chicago Police Officer who was walking her own dog down the same block. Mostek called 911 to report the incident, identifying herself as an off-duty police officer. She told the 911 operator, "there was a dog attacking my dog, and I had to shoot it," and she requested an ambulance for plaintiff, who she said was "freaking out" and "need[ed] help calming down." Am. Compl., ECF 22 at ¶¶ 38, 41.

Officer Nicholas Pronek responded to the scene and spoke with Mostek. According to his police report,

> while struggling with the pitbull, [Mostek's] neighbor and owner of the pitbull, attempted to help with negative results and at that point, [Mostek] drew her service weapon and fired one shot striking the pitbull in the head stopping the attack.

ECF 22-1 at 2. The following week, a Tactical Response Investigation Report was completed in conjunction with the incident. Captain Michael Poppish reviewed the report and concluded based on the information provided that Mostek's use of force "complied with department policy and directives." ECF 22-2 at 3. Plaintiff claims, however, that these reports were based on Mostek's false account of the incident, and that the Chicago Police Department's "investigation" was a sham.

Aggie's fatal encounter with Mostek was captured on video by a residential surveillance camera. Plaintiff describes the footage at length in his complaint, and he also filed the recording in conjunction with his response the City's motion. The video opens abruptly, with Aggie lunging toward Mostek's dog and beginning to bite and wrestle with it on the sidewalk at the corner of South Normal Avenue and West 29th Street. Mostek, standing a few steps north of the corner on Normal Avenue, quickly approaches the corner, just as plaintiff comes into view, running eastbound on 29th Street toward the tangle of dogs at the corner. Plaintiff and Mostek converge on the dogs, and plaintiff appears to kick once at them before falling to the ground next to them. Meanwhile, Mostek stumbles forward toward the dogs and then back, but she remains

upright. As Mostek regains her balance, her own dog trots off northbound on Normal, followed by Mostek. Mostek and her dog quickly enter their home, while plaintiff remains on the ground over Aggie's lifeless body. The entire incident lasts fewer than ten seconds, and the remainder of the video shows various individuals approaching the scene and interacting with plaintiff, who rises from the ground and gesticulates in evident grief and distress.

It is not possible to ascertain from the video the precise moment at which Mostek pulled the trigger. According to plaintiff, by the time Mostek fired, Aggie was no longer a threat, as plaintiff had thrown himself on top of her and pulled her to his chest, while Mostek's dog trotted off unharmed. Plaintiff states: "While still moving and out of balance, Mostek, holding her pistol loosely in one hand, fired one shot at the place where Aggie and Plaintiff were lying side by side on the ground," fatally striking the dog in the ear and missing plaintiff's head by just inches.

In this action, plaintiff sues Mostek pursuant to 42 U.S.C. § 1983, claiming that she deprived him of his Fourth Amendment rights under color of state law by using excessive force in shooting Aggie. He also asserts various state claims against Mostek. Against the City, plaintiff asserts § 1983 claims pursuant to *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658 (1978), for policies, practices, and customs that he attributes to the City

3

and claims caused the deprivation of his constitutional rights. He also asserts state claims against the City for *respondeat superior* and indemnification. According to plaintiff, the Chicago Police Department ("CPD") "automatically engaged in a cover-up in accordance with CPD's well-established pattern and practice of allowing CPD officers to engage in deadly misconduct with impunity." Am. Compl., ECF 22 at ¶ 130.

In total, plaintiff asserts nine claims: (I) a § 1983 claim against Mostek for excessive force; (II) a *Monell* claim against the City for excessive force; (III) a *Monell* claim against the City for failure to train, supervise, and discipline its officers; (IV) a state law claim against Mostek for willful and wanton misconduct; (V) assault against Mostek; (VI) defamation against Mostek; (VII) intentional infliction of emotional distress against Mostek; (VIII) *respondeat superior* against the City; and (IX) indemnification against the City under 745 ILCS 10/1-102 (the "Tort Immunity Act"). The City has moved to dismiss the claims against it. For the reasons that follow, I grant the motion as to the *Monell* claims and deny it as to the state claims.

I.

A motion to dismiss tests the sufficiency of the complaint, not the merits of the plaintiff's case. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). To survive dismissal, a complaint must allege "enough facts to state a claim to relief

that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Section 1983 "provides a civil remedy against any 'person' who violates a plaintiff's federal civil rights while acting under color of state law." *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 523 (7th Cir. 2023). Although municipalities are "person[s]" who may be sued under § 1983, they are liable only for their own violations of federal law; they may not be held vicariously liable for the constitutional torts of their employees. *Dean v. Wexford Health Sources, Inc.*, 18 F. 4th 214, 235 (7th Cir. 2021) (citing *Monell*, 436 U.S. at 691–94 (2018)). Accordingly, to survive the City's motion, plaintiff's allegations must suggest plausibly that: "(1) [he] was deprived of a constitutional right; (2) the deprivation can be traced to some municipal action (i.e., 'a policy or custom'), such that the challenged conduct is properly attributable to the municipality itself; (3) the policy or custom demonstrates municipal fault, i.e., deliberate indifference; and (4) the municipal action was the moving force behind the federal-rights violation." *Thomas*, 74 F.4th at 524 (internal quotation

marks and citations omitted).

The City argues that plaintiff's *Monell* claim fails at each prong, but the overarching theme of its motion is that when Mostek shot Aggie, she was acting as a private citizen, not as a police officer.[1] Indeed, both sides devote the bulk of their arguments to this issue, presumably because if Mostek was acting in her private capacity, plaintiff's constitutional claims against both defendants fail at the outset because any claim under § 1983 requires him to establish "that the alleged deprivation was committed under color of state law." *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019). Having closely examined plaintiff's allegations and the additional materials appropriately before me,[2]

---

[1] As for whether plaintiff otherwise suffered the deprivation of a constitutional right, "[e]very circuit that has considered the issue has held that the killing of a companion dog constitutes a 'seizure' within the meaning of the Fourth Amendment." *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008). So unless Aggie's killing was reasonable under the circumstances, Mostek's alleged actions—if under color of state law—support plaintiff's Fourth Amendment claim. *See id*. ("[T]he use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable.").

[2] *See Citizens Ins. Co. of Am. v. Wynndalco Enters., LLC*, 70 F.4th 987, 995 (7th Cir. 2023); *Bogie v. Rosenberg*, 705 F.3d 603, 608-09 (7th Cir. 2013). To the extent both parties rely on these materials in support of their arguments, I view them, as I must, in the light most favorable to plaintiff. *See Esco v. City of Chicago*, 107 F.4th 673, 679 (7th Cir. 2024). As to the additional materials attached to defendant's reply that plaintiff moves to strike, the City offers those materials largely in support of its under-color-of-law and scope-of-employment issues, on which I rule in plaintiff's favor. At all events, I did not rely on those materials in reaching my decision here. I deny plaintiff's motion to strike for these reasons.

as well as relevant cases from within and outside this circuit, I conclude that this is not a matter I can decide on the record as it currently stands.

It is true that Mostek was off duty when she shot Aggie, but all agree that a police officer's off-duty status "does not resolve the question of whether he or she acted under color of state law." *Gibson* 910 F.2d at 1517 (citation omitted). Indeed, "no bright line distinguishes a police officer's personal pursuits from actions taken under color of state law," *Coles v. City of Chicago*, 361 F. Supp. 2d 740, 748 (N.D. Ill. 2005), and the Seventh Circuit has emphasized "the necessity of a rigorous fact-bound inquiry," *DiDonato v. Panatera*, 24 F.4th 1156, 1160 (7th Cir. 2022).

Whether an officer was acting under color of state law "turn[s] largely on the nature of the specific acts" the officer performed. *Id.* On the one hand, "acts of officers in the ambit of their personal pursuits are plainly excluded" from the scope of § 1983. *Coles v. City of Chicago*, 361 F. Supp. 2d 740, 748 (N.D. Ill. 2005) (quoting *Screws v. United States,* 325 U.S. 91, 111 (1945)). On the other, "[a]cts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it." *Id.* 748 (quoting *Screws*, 325 U.S. at 111) (additional citations omitted).

By the City's lights, "Mostek was acting in self-defense, in defense of her property, and defending Plaintiff from his dog."

Reply, ECF 40 at 8. The City argues that "[t]hese are not actions that only a police officer is authorized to take." *Id.* The City further observes that plaintiff does not allege that Mostek was wearing a uniform or was engaged in police activities prior to the incident. The City underscores that Mostek was defending herself and her own dog and insists that "[a]ny steps Mostek took after the shooting are indistinguishable from those of private actors who would act in a similar way to protect their property." Mot., ECF 33 at 7. But that's not really true. When Mostek called 911 moments after the incident—something a private citizen may or may not have done under the circumstances—she immediately identified herself as an off-duty police officer. Am. Compl. at ¶ 38. Mostek then reiterated her police status when she spoke to the fire department about an ambulance for plaintiff, describing herself as "an off-duty who got into a shooting." *Id.* at ¶ 40. Plaintiff asserts that Mostek emphasized her status as a police officer precisely to clothe her actions in a cloak of authority, and I agree that that is a plausible interpretation of these facts.

Recently, a court in the Eastern District of Michigan declined to grant summary judgment in favor of an off-duty police officer who allegedly violated the Fourth Amendment when he fatally shot the plaintiffs' dog. *Parkes v. Wynne*, No. 20-12650, 2024 WL 4373757, at *4 (E.D. Mich. Sept. 30, 2024). The court concluded that the evidence was sufficient to raise a reasonable inference

that the officer was acting under color of state law, pointing to indications that he "sought to use his status as a law enforcement officer 'advantageously' to justify his actions." *Parkes v. Wynne*, No. 20-12650, 2024 WL 4373757, at *4 (E.D. Mich. Sept. 30, 2024). The court explained:

> [M]oments after the second shot was fired, [Officer] Wynne had already identified himself to others a law enforcement officer. Although Wynne testified that he informed the Oak Park Police Department via 911 that he was a law enforcement officer for the purpose of establishing his authority to carry a gun, it is unclear whether he also announced his status to lend the "indicia of authority" to his actions as bystanders began to gather following Astro's shooting.

*Id.*, 2024 WL 4373757, at *4. Similarly here, a reasonable inference is that Mostek repeatedly identified herself as a police officer to establish her authority to shoot Aggie in her capacity as a peace officer. That she may also have been "motivated by personal interests" does not foreclose the inference that she acted under color of state law. *McGlenn v. Madison Metro. Sch. Dist.*, No. 21-CV-683-JDP, 2024 WL 3169814, at *6 (W.D. Wis. June 25, 2024) (observing that the defendant cited "no Supreme Court or Seventh Circuit cases holding or implying that a public employee cannot act under color of law if his conduct is unauthorized or if he is motivated by personal interests.").

Indeed, that is precisely the position Mostek has taken in this litigation. In answer to the Amended Complaint, Mostek purports to admit that "[a]t all times pertinent hereto, Mostek

was acting under color of state law and within the scope of her employment with the City of Chicago as a sworn police officer[.]" Answer, ECF 35 at ¶ 168. To be sure, Mostek's "admission" is not conclusive as to the legal question whether she was acting under color of state law. *See Chavez v. Guerrero*, 465 F. Supp. 2d 864, 869 (N.D. Ill. 2006) ("[w]hether a defendant acted under color of state law is a question of law for the court"). Nevertheless, the City's insistence that its officer was behaving in a purely personal capacity is in obvious tension with the officer's own view of her conduct. At a minimum, this tension suggests that further factual development is necessary.[3]

Moreover, there is evidence that the CPD likewise considered Mostek to have been engaged in police work when she shot Aggie. The very first line of the Original Case Incident Report describes the incident as "Non-Criminal – Destruction of Animal by Police." ECF 22-1 at 1. The narrative portion of that document states that

---

[3] For example, although neither party's submissions raise the issue explicitly, several of the cases they cite refer to the CPD's "general regulation that requires an officer to be on duty twenty-four hours a day for purposes of responding to emergencies." *Gibson v. City of Chicago*, 910 F.2d 1510, 1517 (7th Cir. 1990); *see also* Coles v. City of Chicago, 361 F. Supp. 2d 740, 742-43 (N.D. Ill. 2005) ("[t]he General Orders of the Chicago Police Department require an off-duty officer to take some action when he observes a crime being committed."). Whether these regulations had any bearing on Mostek's conduct is a factual matter that cannot be determined on the present record.

Mostek was an "off duty police officer" who, in response to Aggie's attack, "drew her service weapon and fired one shot striking the pitbull in the head stopping the attack." *Id.* at 2. And the Tactical Response Report prepared after the incident contains further indicia that Mostek was engaged in police work when she responded to Aggie's attack. The form—which contains a number of boxes that can be checked to indicate the circumstances surrounding an officer's use of force—reflects checked boxes indicating that Mostek responded to a "physical attack without weapon" that amounted to an "ambush," involving "mouth/teeth/spit" and "grab/hold/restrain," and that the subject, i.e., Aggie, "used force likely to cause death or great bodily harm." ECF 22-2 at 1. The report also specifies—again through a checked box—that Mostek discharged her weapon "only to destroy/deter an animal." *Id.* The very fact that Mostek's conduct could be memorialized neatly and succinctly by choosing among standard options available on a pre-printed CPD form itself suggests, contrary to the City's insistence that "Mostek's alleged behavior ha[d] nothing to do with the type of work Mostek is paid to do as a CPD police officer," Mot., ECF 33 at 19, that her actions fell within the realm of routine police work.

For the reasons explained above, I cannot conclude as a matter of law that Mostek was acting in her personal capacity as a private citizen and not under color of state law. But plaintiff's *Monell*

11

claim requires more to survive dismissal: plaintiff must also allege plausibly that a policy, practice, or custom of the City proximately caused the constitutional injury he claims. It is here that his claim falters. In particular, he fails to allege plausibly that municipal action was the "moving force" behind the constitutional deprivation he alleges.

"Three types of municipal action support *Monell* liability: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice[4]; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Thomas v. Neenah Joint Sch. Dist.,* 74 F.4th 521, 524 (7th Cir. 2023) (quoting *Spiegel*, 916 F.3d at 617 (quotation marks omitted)). Although the Amended Complaint once asserts that Mostek was following an "express" policy, it also states that "Mostek's use of deadly force violated CPD's written policies," Am. Compl. at 18, and that Mostek "used

---

[4] This awkward, yet often repeated, description of a "widespread practice" so well-settled as to constitute a "practice" is distilled from the Court's recognition, in *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 167–68 (1970), that the state can not only through its express policies, but also through practices that are "so permanent and well settled as to constitute a 'custom or usage' with the force of law." (citation omitted). Tracing the modern formulation of this type of state action to its roots reveals that the important point is not how the state action is characterized, but rather whether the action is carried out so consistently that it can be deemed to have "the force of law."

excessive force as part of a widespread practice promoted, tolerated, and condoned by a culture of over-aggressive policing in the Chicago Police Department." *Id*. at ¶ 128. Indeed, his opposition to defendant's motion makes clear that his claims rest not on any express policy, but rather on the CPD's alleged *failure* to adhere to its express policies, and instead to embrace a culture of excessive force. *See* Resp., ECF 37 at 8 (arguing that CPD's "written policies regarding excessive use of force are honored only in the breach," and asserting "a widespread practice of excessive use of force that is so permanent and well-settled as to constitute a custom or usage.").

Plaintiff variously characterizes the customs and practices he challenges as:

- a "pattern and practice [that] relies upon overly aggressive tactics that unnecessarily escalate encounters with individuals, increase tensions, and lead to excessive force";

- a "longstanding policy and practice of encouraging officers to point guns at community members without justification";

- a "custom and practice of shooting first and asking questions later";

- a "longstanding pattern and practice of over-aggressive and violent responses to civilian encounters, even in the absence of any crime";

- a "custom and practice of brutality and excessive force anchored in the notion that CPD officers are above the law and protected by a code of silence";

13

- a "pattern and practice of allowing CPD officers to engage in deadly misconduct with impunity"; and

- policies, practices, and procedures "that embrace excessive force and treat[] people 'as animals or subhuman.'"

Am. Compl., ECF 22, at ¶¶ 202, 192, 178, 152, 151, 130, 110. Plaintiff claims that these widespread customs and practices were the "moving force" behind the deprivation of his constitutional rights because they cause officers, including Mostek, "to believe they can abuse and violate individuals' rights without consequence." *Id*. at ¶ 247. But the level of generality at which he describes the challenged practices does not suggest a "direct causal link between the challenged municipal action and the violation of his constitutional rights." *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021) (internal quotation marks and citation omitted).

In *First Midwest Bank*, the Seventh Circuit examined the distinction the Supreme Court drew in *Board of County Commissioners of Bryan County, Oklahoma v. Brown* 520 U.S. 397 (1997), between a claim alleging that "a municipality takes action or directs an employee to take action that facially violates a federal right," and one in which "the plaintiff alleges that the municipality has not directly injured him but instead that it caused an employee to do so." *Id*. at 405. Because plaintiff's claim falls into the latter category, "rigorous standards of culpability and causation must be

applied to ensure that the municipality is not held liable solely for the actions of its employee." *Id*. This means that plaintiff must plead and ultimately prove "deliberate indifference," on the City's part, i.e., that it was obvious that the widespread practices plaintiff identifies would lead to the constitutional violation he suffered and that the City "consciously disregarded those consequences." *First Midwest Bank*, 988 F.3d at 987. "This is a high bar," *id.*, and plaintiff's allegations do not satisfy it.

As factual support for his excessive force claim, plaintiff points to several high-profile cases of police violence in Chicago from the past decade and to the United States Department of Justice's 2017 report, Investigation of the Chicago Police Department. It is true that the DOJ "found that CPD officers engage in a pattern or practice of using force, including deadly force, that is unreasonable." Am. Compl., Exh. 3, ECF 22-3 at 5. But nothing in the report suggests "'a prior pattern of similar constitutional violations' to those he suffered," *Cosby v. Rodriquez*, 711 F. Supp. 3d 983, 1010 (N.D. Ill. 2024) (quoting *Fields v. City of Chicago*, 981 F.3d 534, 562 (7th Cir. 2020)), nor does plaintiff point to anything in the report that would have made it so obvious to the City that its widespread practices would cause the kind of injury he suffered that the City can be deemed to have exhibited deliberate indifference.

*Cosby* and *Fields* offer an instructive contrast, illustrating

15

the kinds of factual allegations that, unlike those here, plausibly suggest a "direct causal link" between the municipal practice challenged and the constitutional injury alleged. In *Cosby*, the plaintiff was a nineteen-year-old Black man arrested during a Black Lives Matter protest in the summer of 2020 for spraying a Chicago Police officer with a toy water gun. He alleged that officers threw him to the ground, then

> held him down even after he went limp; that they restrained him with zip-tie handcuffs and refused to loosen them when he complained of pain; that they repeatedly hit him over the head with a baton while he lay prone; that, when he asked if he could retrieve his lost shoe, an officer replied, "fuck you"; and that, once at the station, he was denied access to a restroom, food, and water for many hours.

*Cosby*, 711 F. Supp. 3d at 1005. The complaint also alleged "numerous instances of these behaviors, both before and during 2020, which together plausibly establish[ed] 'a prior pattern of similar constitutional violations' to those he suffered." *Id*. at 1010 (quoting *Fields*, 981 F.3d at 562). Specifically, the plaintiff alleged that "officers have responded with violence or aggression to protests for decades," *id*. at 991, and he cited specific examples of such violence from demonstrations held in 2003, 2011, and 2016, in which officers reportedly "pushed, attacked, and used batons to beat protesters." *Id*. at 991.

In *Fields*, the plaintiff claimed that Chicago Police officers violated his *Brady* rights by withholding exculpatory evidence that

was contained in a "street file," i.e., a "police file[] withheld from the state's attorney and defense counsel and therefore unavailable as a source of exculpatory information for a prosecutor deciding whether to charge or a defense attorney." *Fields*, 981 F.3d at 542 (citing *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988)). The plaintiff sought to hold the City liable for the *Brady* violation under *Monell*, alleging that its widespread practice of maintaining street files resulted in a "systemic underproduction of exculpatory materials." *Id*. at 562. The City was aware of this practice, the plaintiff claimed, from prior litigation and its own subsequent internal investigation, and it was further aware that the practice "led to harm in some cases." *Id*.[5]

Plaintiff, too, cites prior litigation and related investigations, but the factual circumstances and constitutional injuries at issue in those cases are similar to his only at the very highest level of generality. Take, for example, plaintiff's reference to CPD Officer Jason Van Dyke's fatal shooting of Laquan McDonald in October of 2014. Investigation into that tragedy, and Van Dyke's subsequent conviction for second-degree murder, may

---

[5] I am mindful that *Fields* addressed the evidence required to prevail on a *Monell* claim in the context of a post-trial motion, not the sufficiency of the plaintiff's *Monell* allegations. Nevertheless, it illustrates the kind of concrete and specific practice that a jury could reasonably conclude was the "moving force" behind the violation the plaintiff alleged.

well have put the City on notice of the risk that its officers would fire their weapons at retreating suspects, and that they would provide false accounts of the circumstances surrounding their use of force. *See* DOJ Rep., ECF 22-3 at 25-26, 57-58. But nothing about that case suggests that the City knew and disregarded the risk that its officers would unreasonably shoot a pet dog.[6]

Plaintiff's *Monell* allegations are more like those the court found insufficient in *Mikolon v. City of Chicago*, No. 14 CV 1852, 2014 WL 7005257, at *4 (N.D. Ill. Dec. 11, 2014). In *Mikolon*, the plaintiff claimed that Chicago Police officers subjected him to an unconstitutional search, and that the City was liable for the violation because it "encouraged the types of constitutional injuries that plaintiffs purportedly sustained in this case by maintaining, protecting, or accepting" policies and practices including a "code of silence... whereby officers remain silent or give false and misleading information during official investigations to cover up unconstitutional and criminal misconduct," a "failure to adequately investigate and substantiate

---

[6] Plaintiff tries to characterize Mostek's conduct in a way that more closely resembles Van Dykes's by emphasizing the proximity of his own head to Aggie's and alleging that she "pointed her gun at [him] and fired." Am. Compl., ECF 22 at ¶ 192. But plaintiff does not contend, nor does anything in the record suggest, that Mostek was aiming at or intending to shoot plaintiff. Her actions cannot reasonably be compared to Officer Van Dyke's.

allegations of unconstitutional and criminal misconduct by police officers," and a failure to discipline officers who engage in unconstitutional conduct. *Id.*

The court held that these allegations failed to state a viable *Monell* claim, explaining that *Monell*'s proximate cause requirement meant that plaintiffs "must plead enough facts to plausibly suggest a direct causal link between the purported municipal policy and the alleged constitutional deprivation." *Mikolon*, 2014 WL 7005257, at *4 (citations and internal quotation marks omitted). It concluded that "[v]ague allegations that the City failed to train its law-enforcement officers in avoiding unconstitutional and criminal misconduct, or that the City failed to investigate allegations of (or discipline its officers as to) the same, do not satisfy this requirement." *Id.* (citations and internal quotation marks omitted). Plaintiff's *Monell* allegations are similarly inadequate.

This leaves plaintiff's state claims for *respondeat superior* and indemnification, both of which turn on the issue of whether the Amended Complaint adequately alleges that Mostek was acting within the scope of her employment at the time of her allegedly unlawful conduct. *See Fuery v. City of Chicago*, No. 07 C 5428, 2014 WL 1228718, at *6 (N.D. Ill. Mar. 25, 2014) ("[t]he scope of employment analysis is the same for purposes of *respondeat superior* liability...and indemnification...under the Tort Immunity Act, 745

ILCS § 10/9-102.").

> Under Illinois law, there are three necessary criteria
> for an employee's action to be within the scope of his
> employment. First, the relevant conduct must be of the
> kind that the employee was employed to perform. Second,
> the conduct must have occurred substantially within the
> time and space limits authorized by the employment. And
> third, the conduct must have been motivated, at least in
> part, by a purpose to serve the employer.

*Elston v. Cnty. of Kane*, 948 F.3d 884, 887 (7th Cir. 2020).

Although the "two elements of 'under color' and 'scope of

employment' should not be confused," *id.*, *Coles v. City of Chicago*,

361 F. Supp. 2d 740, 746 (N.D. Ill. 2005), many of the facts

discussed above in conjunction with the former issue are relevant

as well to the latter.

For example, the City contends that plaintiff has not pled

the first element—that Mostek's actions were of the kind she was

employed to perform—but as noted above, the pre-printed Tactical

Response form used to summarize and analyze an officer's use of

force contains several boxes corresponding to the actions Mostek

took, and, indeed, the Case Incident Report characterizes the

incident as "Non-Criminal – Destruction of Animal by Police." ECF

22-1 at 1. These facts are sufficient to raise an inference that

Mostek's actions were of the kind she was employed to perform.

As for whether Mostek's actions were at least partially

motivated by a purpose to serve her employer, when all inferences

from the record are drawn in plaintiff's favor, Mostek's statements

20

in the record and her "admission" that she was acting within the scope of her employment can be construed as reflecting her subjective belief that she was acting as a Chicago Police officer throughout the events in question. That is sufficient at this stage. *See Lyons v. Adams*, 257 F. Supp. 2d 1125, 1140 (N.D. Ill. 2003) (noting "the importance of the defendant's subjective intent to the scope of employment issue under Illinois law.").

The City's final arguments are that it cannot be held liable either for punitive damages or for indemnification or *respondeat superior* based on plaintiff's defamation claim against Mostek. Because plaintiff offers no response to these arguments, I dismiss these claims for the reasons the City articulates.

## III.

For the foregoing reasons, defendant's motion to dismiss is granted as to plaintiff's *Monell* claims (Counts II and III of the Amended Complaint) and his prayer for punitive damages against the City. In addition, any claim seeking to hold the City liable for Mostek's alleged defamation is dismissed. The City's motion is otherwise denied.

**ENTER ORDER:**

**Elaine E. Bucklo**
United States District Judge

Dated: November 4, 2024