IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Kent Maynard, Jr., | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | No. 24 C 3612 |
| | ) | |
| | ) | |
| The City of Chicago and | ) | |
| Carmen Mostek, | ) | |
| | ) | |
|     Defendants. | ) | |

<u>Memorandum Opinion and Order</u>

Off-duty Chicago police officer Carmen Mostek shot and killed Kent Maynard's dog. Maynard sued Mostek and her employer the City of Chicago under Section 1983 and Illinois law. Pending before me are three motions for summary judgment: two from Mostek and one from Chicago. For the reasons that follow, I deny Chicago's motion, grant one of Mostek's, and grant her other in part.

**I.**

   While the parties contest what went on during the few seconds at the heart of this case, much of the surrounding factual landscape is undisputed.[1] Maynard and Mostek were neighbors. Mostek

---

[1] In the Northern District of Illinois, motions for summary judgment are subject to Local Rule 56.1. This rule requires the moving party to submit a "statement of material facts," to which the opposing party can respond; it then allows the opposing party to submit his own "statement of additional material facts" to which the moving party can respond. L.R. 56.1(a)-(c). The purpose of L.R. 56.1 is to provide me with a roadmap to the record in general and the disputed facts in particular. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

Despite that noble purpose, L.R. 56.1 filings can proliferate, especially in a case like this, where defendants' three motions resulted in three initial statements of fact and responses and then three statements of additional facts and responses.

Defendants point out that many of Maynard's responses to their L.R. 56.1(a)(2) statements make legal argument instead of simply admitting or denying each paragraph as required by L.R. 56.1(e). They are not wrong. But they commit similar sins when responding to Maynard's statements of additional fact (for example, replying to clearly material facts with the initial assertion "this is not a material fact" before, after copious additional argument, proceeding to admit them). And while defendants for some reason entitled their initial L.R. 56.1 filings "Statements of *Undisputed* Material Facts," they are made up, in pertinent part, of disputed material facts. This thicket of filings was unhelpful.

Luckily, the locus of operative fact in this case is a video which largely speaks for itself.

It may be edifying for any interested party to peruse Judge Iain D. Johnson's Standing Order on Motions for Summary Judgment, https://www.ilnd.uscourts.gov/judge-cmp-detail.aspx?cmpid=769 ("At the risk of sounding like Jerry Seinfeld, did you ever

owned a corgi named Buddy, while Maynard owned a pitbull terrier mix named Aggie. On April 21, 2024, Mostek was walking her dog. Mostek and Buddy were moving north on Normal Avenue towards the corner with 29th Street. As they were nearing the intersection, Maynard's dog Aggie escaped his home. Aggie ran east along 29th Street towards Normal Avenue with Maynard in pursuit.

Aggie, Mostek, and Buddy reached the corner of 29th and Normal at nearly the same time, and Aggie and Buddy began to fight or wrestle. Mostek pulled out a firearm. Maynard reached the corner and attempted to interpose himself between the dogs. As Maynard was doing so, Mostek ran into him. Maynard tumbled to the ground, grabbing Aggie on his way down. Almost in the same moment, Mostek discharged her firearm, killing Aggie. After the shot, Mostek walked, then ran, to her apartment, which was a few yards away.

Maynard's first amended complaint ("complaint") frames his claims in seven counts.[2] Maynard asserts that in the encounter on April 21, Mostek violated his rights against unreasonable seizures pursuant to 42 U.S.C. § 1983 (Count I), acted willfully and

---

notice that procedures allegedly designed to streamline litigation often don't?").

[2] The complaint originally contained nine counts. I dismissed Counts II and III (dealing with *Monell* liability) pursuant to defendants' motion under Fed.R.Civ.P. 12(b)(6). ECF 49.

wantonly (Count IV), assaulted him (Count V), and intended to cause him emotional distress (Count VII). He alleges that after the April 21 incident, Mostek defamed him to their mutual landlord (Count VI). Maynard further alleges that Mostek's employer, Chicago, is liable for her wrongdoing by way of *respondeat superior* (Count VIII) and a state law requiring indemnification of municipal employees (Count IX). The defendants have filed three motions for summary judgment: one from Mostek individually as to Count VI; one from Mostek with Chicago's support as to Counts I-V and VII; and one from Chicago as to Counts VIII and IX.

## II.

Summary judgment is appropriate where the record shows that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A genuine issue for trial exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The movant must identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986) (citations omitted). "Once a summary judgment motion is made and properly supported, the adverse

party may not rest on the mere allegations of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Macklin v. Butler*, 553 F.2d 525, 528 (7th Cir. 1977). (citations omitted). I construe all facts in the light most favorable to the non-movant and draw all justifiable inferences in favor of that party. *Liberty Lobby,* 477 U.S. at 255.

### III.

### A. Count I—Section 1983

### 1. Scope

The parties first dispute what Maynard's Section 1983 claim encompasses. In Count I, Maynard asserts that Mostek violated his rights by "point[ing] a gun" at him and discharging it near him when "no reasonable officer could have considered" him or Aggie to be a threat. ECF 22 at 33. In his response to Mostek's motion for summary judgment, though, Maynard presents two theories, neither of which appears in Count I: first, that Mostek unreasonably seized his person when she "shoulder[ed] or body-block[ed] him" as he was trying to reach Aggie; and second, that Mostek unreasonably seized Aggie when she shot her. ECF 120 at 5-7.

Mostek argues that Maynard must be held to the language in Count I of the complaint, citing *Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir. 1996), for the proposition that a plaintiff "cannot introduce new factual theories for the first time in

response to summary judgment motions." ECF 138 at 4. Maynard sur-replies that *Shanahan*'s rule has been abrogated by *Schmees v. HC1.com, Inc.*, 77 F.4th 483, 488–89 (7th Cir. 2023). ECF 145 at 2. Maynard is correct, but both parties are off base.

*Shanahan* stands for the proposition that a party may not amend his complaint through a brief in opposition to summary judgment. 82 F.3d at 781. *Schmees* abrogated that holding as unsupported by the Federal Rules of Civil Procedure and insufficiently supported by case law. 77 F.4th at 488–89. The *Schmees* court found that, while it would be "all but impossible for a counselled plaintiff to establish" the need to amend her complaint by way of a response to a motion for summary judgment, a district court could, within its discretion, allow such an amendment. *Id.* at 489.

What both parties have misunderstood is that *Shanahan* and the line of cases that *Schmees* overruled were referring to factual amendments—the attempt by plaintiffs to add new facts in summary judgment briefing. *Shanahan*, 82 F.3d at 779; *Schmees*, 77 F.4th at 488. Neither case was dealing with a party bringing new *legal* theories at the summary judgment stage, which is less objectionable. "The Federal Rules of Civil Procedure do not require a plaintiff to plead legal theories." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017) (citations omitted). "Accordingly, when a plaintiff does plead legal

theories, it can later alter those theories," and, generally, "district courts should not hold plaintiffs to their earlier legal theories unless the changes unfairly harm the defendant or the case's development." *Id.*

Maynard's response to Mostek's motion for summary judgment does not constitute an attempt to amend his complaint, even if he thinks it does, because it does not raise new facts. First, while the language in Count I spoke only to one legal theory—Mostek seizing Maynard by pointing a gun at him—Maynard pled plenty of facts dealing with the 'body-check' theory: "As [Maynard] seemed about to reach down and grab Aggie, Mostek shouldered him to the right, away from his dog...Mostek continued to push her right shoulder against [Maynard]...Mostek continu[ed] to exert pressure against [Maynard] until he [fell] to the ground." ECF 22 at 12. And second, the bulk of the complaint is geared towards the other theory—that Mostek killed Aggie unreasonably. Because the slight change in direction harms neither the defendants nor the development of the case, I do not cabin Maynard to the legal theory in his complaint.

There are, then, two claims at issue: that Mostek used excessive force in seizing Maynard's person when she contacted him at the corner; and that Mostek unreasonably seized Aggie when she

7

shot and killed her. Mostek argues as to each that she is entitled both to summary judgment on the merits and to qualified immunity.

## 2. Law

Section 1983 "provides a civil remedy against any 'person' who violates a plaintiff's federal civil rights while acting under color of state law." *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 523 (7th Cir. 2023). Mostek does not dispute in her motion for summary judgment that she was acting under color of law.

Excessive-force claims are reviewed subject to the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 396–97 (1989). This standard requires an examination of the "totality of the circumstances to determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government[al] interests at stake." *Jacobs v. City of Chicago,* 215 F.3d 758, 773 (7th Cir. 2000). The excessive-force inquiry is fact-specific. *See, e.g.*, *United States v. DiSantis*, 565 F.3d 354, 364 (7th Cir. 2009). "Summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010).

Every circuit that has yet considered the question "has held that the killing of a companion dog constitutes a 'seizure' within

the meaning of the Fourth Amendment." *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008) (collecting cases); *accord Ray v. Roane*, 948 F.3d 222, 230 (4th Cir. 2020) (same). Courts across the country have also agreed that the killing of a household pet is unreasonable and thus unconstitutional unless (1) the pet poses an immediate danger and (2) the use of force is unavoidable. *Viilo*, 547 F.3d at 710; *accord Ray*, 948 F.3d at 230.

"Governmental actors performing discretionary functions enjoy qualified immunity, meaning that they are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Volkman v. Ryker*, 736 F.3d 1084, 1089-90 (7th Cir. 2013) (citations omitted). I evaluate a claim of qualified immunity in two steps. The "initial inquiry" is whether, when "[t]aken in the light most favorable to the party asserting the injury," the facts show the violation of a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In the second step, I determine "whether that particular constitutional right was 'clearly established at the time of the alleged violation.'" *Ryker*, 736 F.3d at 1090 (citations omitted). Under neither prong may I "resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

### 3. Discussion

### a. Summary Judgment and Qualified Immunity Step One

Both the merits and the first step of the qualified immunity inquiry present the same question at summary judgment: reading all the facts in the light most favorable to Maynard, did Mostek subject him to either excessive force or an unreasonable seizure under the Fourth Amendment? *Liberty Lobby*, 477 U.S. at 255; *Saucier*, 533 U.S. at 201.

As to the excessive force claim, Mostek argues that she never seized Maynard. A seizure occurs when a reasonable person would feel that a government actor has restrained his freedom of movement through physical force or a show of authority. *United States v. Mendenhall*, 446 U.S. 544, 552–54 (1980). The Supreme Court has found, however, that a seizure only occurs if the government actor, in using force or showing authority, *intends* to effect a seizure. *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1988).

Mostek maintains that it is "undisputed" that her "use of force was directed exclusively at [Aggie], not at Maynard," meaning that she had no intent to seize him and, thus, that no seizure took place. ECF 104 at 5. But Maynard disputes that Mostek directed her use of force exclusively at Aggie. Maynard pled that Mostek intentionally contacted him to prevent him from reaching Aggie. ECF 22 at 12. In his response to Mostek's Local Rule 56.1

statement, Maynard cites his deposition, where he testified that "[Mostek] was pressing against me...she's doing what looks like, you know, a block, almost a football like block against me...she literally used enough force to push me to the ground." ECF 121 at 5; 94-5 at 5-6. And looking at the Ring camera footage that both parties agree depicts the incident at issue, I find that a jury could agree that Mostek intentionally restrained Maynard's movement. ECF 42 ("Ring video") at 00:03-00:06.[3]

Whether Mostek's actions were reasonable depends on whether she "used greater force than was reasonably necessary" to effect her aim. *Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009) (citations omitted). Mostek does not argue the reasonableness of the seizure of Maynard's person; that is, in any case, generally a question for the jury to resolve. *Mukwonago*, 624 F.3d at 862 ("'[W]hen material facts are in dispute, then the case must go to the jury, [if] the argument is that the police acted unreasonably because...they responded overzealously and with too little concern for safety.'") (quoting *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003)).

---

[3] There are two videos linked at ECF 42. What I refer to as the Ring video is the longer of the two, titled Log #2024-0003540 3rd Party 1-949971398.mp4.

As to the unreasonable seizure of property claim, Mostek does not dispute that she seized Aggie by shooting her. Instead, she argues that the seizure was reasonable in light of the circumstances, citing *Graham v. Connor* for the proposition that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." 490 U.S. 386, 397 (1989). Mostek acknowledges that under *Viilo*, "the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." 547 F.3d at 710. She argues that under that standard, her actions were reasonable: it is "beyond dispute that Aggie posed an immediate danger" at the time of the shot because "Buddy remained in the immediate vicinity...and had not [yet] escaped." ECF 138 at 8. Mostek likewise contends that the shooting was unavoidable, because she "waited for Maynard to intervene, determined that he could not control Aggie, and then acted only after determining that Maynard was out of the line of fire." *Id.* at 9.

But again, Maynard disputes these characterizations. First, he admits the paragraph in Mostek's Local Rule 56.1 statement which reads that "Maynard grabbed Aggie and pulled her toward his chest" before the shot. ECF 121 at 5. Second, he disagrees that, having

grabbed Aggie, he could not control her. *Id.* at 5–6, 12. And third, he refers to the Ring video, which does not reflect the kind of deliberation that Mostek describes when she says that she "determined" that Aggie was not in control and then, "only after determining that Maynard was out of the line of fire," decided to fire her weapon. *Id.* at 6; Ring video at 00:00–00:06.

Mostek argues that under *Graham*, she should be granted the benefit of the doubt as a police officer responding to a situation over a matter of seconds. 490 U.S. 396–97. But the length of time cuts both ways—it is difficult to see how anyone in the span of six seconds could determine that the "unavoidable" solution to a tussle between two dogs, one in the arms of its owner, would be to shoot one of them. *Viilo*, 547 F.3d at 710. I cannot find that Mostek's actions were reasonable—and thus constitutional—without resolving outstanding factual disputes in her favor. *Bell*, 321 F.3d at 640 ("[w]hen material facts are in dispute, then the case must go to a jury.").

### b. Qualified Immunity Step Two

Having determined that a reasonable jury could find that Mostek used excessive force and unreasonably seized Maynard's dog, I must now ask whether his rights to be free from Mostek's specific actions were "clearly established at the time of the alleged

violation[s]" in April 2024. *Ryker*, 735 F.3d at 1090 (citations omitted).

Mostek at this step addresses only Aggie's seizure. She argues that the facts—"an officer shooting an attacking dog while its owner is physically holding it"—were so novel that the case law had not clearly established Maynard's right not to have his dog shot in such a situation. ECF 138 at 9–10. The Supreme Court has admonished that, in evaluating whether a right has been clearly established, courts should define the right neither too generally nor too specifically. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "The contours of the right must be sufficiently clear that a reasonable official" would understand the right to exist in the particular circumstances at hand, but this is "not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Id.* Even a prior opinion addressing the legal principle at issue is not necessarily required: "There might be no decision...simply because the existence of the right was so clear...that no one thought it worth while to litigate the issue." *Burgess v. Lowery*, 201 F.3d 942, 945 (7th Cir. 2000). Distilled down, I ask, "Would a [state actor] who was conversant with constitutional case law have known that he could not do the things that [he] did?" *Anderson v. Romero*, 72 F.3d 518, 523 (7th Cir. 1995).

14

The level of specificity at which *Viilo* defined the right to be free from killings of household animals is appropriate. It is only reasonable for a state actor to destroy a pet with an owner looking on if "the pet poses an immediate danger and the use of force is unavoidable." *Viilo*, 547 F.3d 710. That right was clearly established at the time Mostek shot Aggie. *See id.*; *accord Ray v. Roane*, 948 F.3d 222, 230 (4th Cir. 2020) (collecting cases from six other circuits).

Mostek contends that, under this standard, she should receive qualified immunity because Aggie was unrestrained and posed an imminent threat to either her or her dog Buddy. ECF 138 at 9–11. There are two problems with that argument. First is that Mostek is trying to import reasonableness, from the first prong of the immunity inquiry, into the second prong, which deals only with whether the right at issue has been clearly established. *Tolan*, 572 U.S. at 656. The second problem is that to agree with Mostek, I would have to discount Maynard's version of the facts—in which Aggie was never a serious threat to anyone and, at the moment of the shooting, was entirely restrained—in favor of hers, which I cannot do at summary judgment. *Id*.

Mostek does not make any argument as to the excessive force claim under the second prong of the qualified immunity inquiry, but I note the following. It is unlawful for the government to use

15

more force than necessary to effect a lawful detention. *Gonzalez*, 578 F.3d at 539. By the same token, police may not "shove, push, or otherwise assault innocent citizens" when they have no reason to effect a detention at all. *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996). Maynard's right to be free of a shove or push, when he was under no suspicion, was clearly established.

Mostek is not entitled to summary judgment either on the merits or on qualified immunity at Count I.

### B. Count IV—Willful and Wanton Misconduct

In this count, Maynard alleges that Mostek's acts were "willful, wanton, and deliberately indifferent to" his safety. ECF 22 at 37–39. Mostek contends that "willful and wanton misconduct" is not a tort in Illinois. Maynard does not dispute that contention. Mostek is entitled to summary judgment at Count IV.

### C. Counts V and VII—Assault and Intentional Infliction of Emotional Distress

#### 1. Merits

In Count V, Maynard alleges that Mostek assaulted and battered him. In Illinois, assault is "an intentional, unlawful offer of corporal injury by force...under such circumstances as to create a well-founded fear of imminent peril." 3 Ill. Law and Prac., Assault, Battery and Bodily Harm § 1. A battery "is the unlawful touching of the person of another," and occurs where (1) an

individual "acts intending to cause a harmful or offensive contact" with another person, and (2) that contact occurs. *Id.*

Mostek argues first that there is "no evidence in this case" which shows that she intended to cause Maynard the "imminent apprehension" of "harmful or offensive contact." ECF 104 at 13. Rather, because her actions were directed at Aggie, "it would not be objectively reasonable for Maynard to believe Mostek was attempting to batter *him*." *Id.* (emphasis in original). Her second contention is that Maynard's timeline cuts off her liability. Assault requires that the plaintiff be placed in fear of an imminent injury, and Maynard testified that he only saw Mostek's gun after she had fired it. *Id.* at 13–14. Maynard thus could not have anticipated a battery from the gun because it had already battered Aggie by the time that he saw it. *Id.*

I again cannot find for Mostek without resolving factual disputes in her favor. Maynard contends that Mostek intended to physically block him from reaching Aggie (the same contact that was the subject of his excessive force claim) and his deposition supports that contention. ECF 120 at 13; 94-5 at 5. And it is not dispositive that Maynard noticed the gun only after Mostek fired it. The video shows that it was, for a few brief moments, pointed at the conjunction of his and Aggie's persons, and he could have

17

anticipated it being fired again, as he apparently did. ECF 120 at 13; Ring video at 00:00–00:10.

In Count VII, Maynard alleges that Mostek intentionally caused him emotional distress. To state a claim for the intentional infliction of emotional distress ("IIED") in Illinois, a plaintiff must show that "'(1) the defendant's conduct was extreme and outrageous; (2) the defendant either intended to inflict severe emotional distress or knew that there was a high probability that his conduct would do so; and (3) the defendant's conduct actually caused severe emotional distress.'" *Lujano v. Town of Cicero*, 691 F. Supp. 2d 873, 884 (N.D. Ill. 2010) (quoting *Cangemi v. Advocate S. Suburban Hosp.*, 845 N.E.2d 792, 813 (Ill. App. Ct. 2006)).

Mostek first contends that there is no evidence that she "intended to cause [Maynard] emotional distress," citing *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988), for the proposition that a defendant's purpose is a critical factor in IIED analysis. ECF 104 at 14. Second, Mostek asserts that her actions do not clear the "exceptionally high bar" that Illinois sets for IIED, where conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.'" ECF 104 at 14 (quoting *Public Finance Corp. v. Davis*, 360 N.E.2d 765, 767 (Ill. 1976)).

18

*McGrath* stands for the proposition that a tortfeasor can either *intend* to cause emotional distress *or* can merely "know that there is at least a high probability that his conduct will cause severe emotional distress." 533 N.E.2d at 809. What Mostek intended is, again, a matter of disputed fact; Mostek does not argue that she was unaware that shooting Aggie might cause Maynard distress.

As to the outrageousness of Mostek's behavior, I refer to the Ring video. There are two relevant interpretations of that video at which a reasonable observer could arrive. The first is that Mostek unholsters a firearm whose safety is off and accidentally discharges that firearm into a dog when she stumbles on Maynard's body. The second, more in line with Mostek's reading, is that within seconds of two pet dogs beginning a fight, she cooly unholstered a firearm, took the safety off, and discharged it into a dog in the arms of its owner. A reasonable jury could well decide that either of those scenarios was outrageous.

### 2. Immunity

Mostek asserts that the Illinois Local Government and Governmental Employees Tort Immunity Act ("Immunity Act") provides immunity to Maynard's state claims, citing a provision which reads:

> Neither a local public entity nor a public employee is liable for failure to establish a police department or otherwise provide police protection service or, if police protection service is provided, for failure to provide adequate police protection or service, failure to prevent the commission of crimes, failure to detect

19

> or solve crimes, and failure to identify or apprehend
> criminals. This immunity is not waived by a contract for
> private security service, but cannot be transferred to
> any non-public entity or employee.

745 Ill. Comp. Stat. 10/4-102. While other sections of the Immunity

Act make exceptions for certain kinds of "willful and wanton"

misconduct on the part of public employees, the quoted section

does not. Maynard responds that this section of the Immunity Act

deals only with the *failure* of a public entity or employee to

provide service and not, as here, with a public employee's

affirmative acts. Maynard contends that another section of the

Immunity Act applies. That section reads:

> A public employee is not liable for his act or omission
> in the execution or enforcement of any law unless such
> act or omission constitutes willful and wanton
> misconduct.

745 Ill. Comp. Stat. 10/2-202.

I agree with Maynard. Section 10/4-102 deals by its own terms

with the non-provision of services. It prohibits citizens from

suing, for example, when a police department fails to prevent a

crime, *Holder v. Ivanjack*, 39 F. Supp. 2d 965, 972 (N.D. Ill.

1999), perform adequate crowd control, *McLellan v. City of Chicago

Heights*, 61 F.3d 577, 578 (7th Cir. 1995), or respond quickly

enough to a 911 call, *Carolan v. City of Chicago*, 121 N.E.3d 918,

922-23 (Ill. App. Ct. 2018). Section 10/2-202 applies where, as

here, someone alleges that a public employee, through some

20

*affirmative* act, committed a tort. *Ivanjack*, 39 F. Supp. 2d at 972.

To pierce Mostek's immunity under Section 10/2-202, Maynard needs to show that her conduct was willful or wanton, meaning that it displayed "an actual or deliberate intention to cause harm or which, if not intentional, show[ed] an utter indifference to or conscious disregard for the safety of others or their property." 745 Ill. Comp. Stat. 10/1-210. At summary judgment, I can find for Mostek only if the evidence so points away from willful or wanton conduct that "'no contrary determination based on that evidence could ever stand.'" *Gilbert v. City of Chicago*, 404 F. Supp. 3d 1215, 1233 (N.D. Ill. 2019) (quoting *Urban v. Village of Lincolnshire*, 651 N.E. 2d 683, 689 (Ill. App. Ct. 1995)).

As with the discussion of outrageousness above, the Ring video alone creates enough of a dispute of fact that Mostek is not entitled to state law immunity. One reasonable reading of the Ring video is that Mostek unholstered her off-duty weapon, switched off the safety, had her finger on the trigger, and held the firearm so carelessly that, when she stumbled on Maynard's supine body, it was pointed in his direction *and* went off by accident, killing, in what was a lucky break for Mostek, Aggie and not Maynard. A reasonable jury could find that such behavior constituted "an utter

indifference to or conscious disregard for the safety of others or their property." 745 Ill. Comp. Stat. 10/1-210.

### D. Count VI—Defamation

In this count, Maynard alleges that Mostek defamed him by telling their mutual landlord that Aggie was a "dangerous and vicious pit bull" and that Maynard allowed Aggie "to run amok in the Bridgeport neighborhood." ECF 22 at 40. It is not clear to me where Maynard gets the language in these quotations, and the problems with his Rule 56.1 statement of additional fact, including the lack of accurate pincites, do not help. I cannot find the word "amok" anywhere in the record except in Maynard's filings and where Mostek quotes them; the only place "vicious" appears in the record other than those filings is in the mouth of Maynard's counsel, tried to impute its usage to Mostek during her deposition. ECF 114-12 at 171 (asking, in the context of the memorial for Aggie, "Were you surprised to see that so many people in the neighborhood were so attached to this vicious dog?").

As far as I can tell, the communications that are actually the subject of the defamation claim are a set of text messages between Mostek and Mostek and Maynard's mutual landlord.[4] ECF 123

---

[4] It is clear from Maynard's counsel's handling of the messages that they are supposed to have been the defamatory smoking gun.

22

at 3–4; ECF 124 at 10. None of Maynard's quotes appear in those messages. Instead, the part that Maynard appears to refer to reads, "I mean this guy [Maynard] can't even accept it's his fault for not containing his dog and that his dog got out and I don't even think he's taking any accountability or even acknowledging his dog was in the process of killing my dog."[5] ECF 125-10 at 5.

In Illinois, a defamation plaintiff must prove that (1) " the defendant made a false statement about the plaintiff," (2) "the defendant made an unprivileged publication of that statement to a third party," and (3) "the publication caused damages." *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009). The statement must be of the kind that would tend "to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with her." *Bryson v. News America Publications, Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996). Unless the statement falls into a particular category constituting

---

From counsel to Mostek at her deposition: "Q. Want us to pull up the text messages? Because they don't agree with you. We can have your testimony here direct from your mouth or I can pull up the text messages and we can show you what you told her." ECF 114-12 at 168.

[5] One of Maynard's issues with the messages is that they led to his eviction. His occupancy of his apartment, where he appears to have illegally overstayed a sublease, rather than Aggie, is what the bulk of the conversation is about.

defamation *per se* (statements which tear down a person's professional standing or which allege infection with a venereal disease, among others), then the plaintiff must show that he has suffered pecuniary harm as a result of the statement. *Id.*

Mostek argues in her motion that her statements were true, that they were not of the kind that would harm someone's reputation, and that Maynard suffered no pecuniary harm because of them. ECF 100 at 5. I agree with each of her contentions as to parts of the text message. The message makes several claims: (1) it was Maynard's fault that Aggie escaped; (2) Maynard was refusing to accept that Aggie's death was his fault for having permitted the escape; (3) Maynard was refusing to take accountability; (4) Aggie was in the process of killing Buddy when Mostek shot her; and (5) Maynard was refusing to acknowledge point (4).

There is no dispute of fact that point (1) was true, so it cannot be defamatory. Points (2), (3) and (5) are likewise true— they are more or less the driving force behind this lawsuit. And point (4), about Aggie's behavior, is not the kind of statement which would "cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with [him]." *Bryson*, 672 N.E.2d at 1214. Moreover, Maynard has not shown that he suffered any pecuniary harm as the result of this statement. He was indeed evicted because

24

of the conversation, but only because the conversation alerted his landlord, who apparently thought he had already left his sublease, to the fact that he was still living there. ECF 114-12 at 165–69.

Mostek is entitled to summary judgment as to Count VI.

### E. Counts VIII and IX—*Respondeat Superior* and Indemnification

In the last two counts, Maynard seeks to make Chicago financially responsible for any judgment against Mostek. He proceeds at Count VIII under a theory of *respondeat superior* and at Count IX pursuant to the Immunity Act, which directs local public entities to pay "any tort judgment or settlement for compensatory damages" incurred by their employees. 745 Ill. Comp. Stat. 10/9-102. In order for a plaintiff to recover from an employer under either avenue in Illinois, the tortfeasor employee must have been acting within the scope of her employment. *See Lyons v. Adams*, 257 F. Supp. 2d 1125, 1138–39 (N.D. Ill. 2003); 745 Ill. Comp. Stat. 10/9-102. Chicago, which would rather not indemnify Mostek, argues that she was acting outside of the scope of her employment when she shot Aggie.

For a tortfeasor's conduct to have been within the scope of her employment: (1) "the relevant conduct must be of the kind that the employee was employed to perform;" (2) "the conduct must have occurred substantially within the time and space limits authorized by the employment;" and (3) "the conduct must have been motivated,

25

at least in part, by a purpose to serve the employer." *Elston v. County of Kane*, 948 F.3d 884, 887 (7th Cir. 2020) (citing *Adames v. Sheahan*, 909 N.E.2d 742, 755 (Ill. 2009)). Because of the fact-specific nature of the three elements and the room for interpretation of each, Illinois courts disfavor deciding the scope of employment issue at this stage:

> Summary judgment is generally inappropriate when scope of employment is at issue...Only if no reasonable person could conclude from the evidence that an employee was acting within the course of employment should a court hold as a matter of law that the employee was not so acting.

*Pyne v. Witmer*, 543 N.E.2d 1304, 1308 (Ill. 1989); *accord Bagent v. Blessing Care Corp.*, 862 N.E.2d 985, 992–93 (Ill. 2007).

Chicago makes lengthy arguments as to each element of scope of employment, which belies to some degree its contention that in a case as straightforward as this one, I must decide the issue as a matter of law. ECF 95 at 5–13.

As to the first factor, a major consideration is whether the employer has forbidden the conduct at issue or whether it has encouraged it. *Bagent*, 862 N.E.2d at 994. As Maynard points out, responding to "situations where the immediate safety and well-being of a person is threatened by an animal" is explicitly within a Chicago police officer's remit. ECF 112 at 4–5 (referencing ECF 114-17, Chicago Police Department Special Order S04-12 "Incidents Involving Animals"). Chicago argues that in many ways, Mostek's

26

behavior after the shooting was not that of an ideal officer. Maynard responds, that in the wake of the shooting, CPD treated Mostek much more like an officer than a civilian who had just discharged a concealed firearm on the street. Both arguments have their merits, and the jury will have to weigh them.

As to the second factor, Chicago contends that Mostek's having been off duty at the time she shot Aggie practically decides the question. But "the fact that an employee engaged in conduct outside of work hours, standing alone, is not dispositive." *Elston v. County of Kane*, 948 F.3d 884, 887 (7th Cir. 2020). And, as Maynard notes, while Mostek was not on a shift at the time, she had come off of one that morning and would go on again that evening. ECF 112 at 10. More, unlike the officers in *Elston*, 948 F.3d at 887-88, or *Anderson v. Moussa*, 250 F. Supp. 3d 344, 348-49 (N.D. Ill. 2017), Mostek was not outside of her county or jurisdiction—she was in Chicago, where she works.

As to the third factor, the Illinois Supreme Court has said that, "rather than the needs and requirements of the employer," it is "*the state of mind of the employee* that is material." *Bagent,* 862 N.E.2d 985 at 995 (emphasis in original). Chicago argues that Mostek's motivation for shooting Aggie was "purely personal" based on some of her statements on scene. ECF 95 at 12. Maynard responds that Mostek herself was very clear in her deposition and elsewhere

27

that she saw herself on April 21, 2024, as acting in her police capacity and in furtherance of her role as a policewoman. ECF 112 at 11–12. Chicago replies that Mostek's statements were self-serving. They may well have been—time, and the jury, will tell.

**IV.**

As to Counts IV and VI, I grant the pending motions for summary judgment. As to the remainder, I deny them.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: February 9, 2026

28